# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SAHAI PTY, LTD., ) | |
|     Plaintiff, ) | |
| ) | No. 09 CV 7350 |
| v. ) | Judge Blanche M. Manning |
| ) | |
| SASSY, INC., ) | |
|     Defendant. ) | |

## MEMORANDUM AND ORDER

Plaintiff Sahai Pty, Ltd. was Australia's exclusive distributor of baby products made by Sassy, Inc., an Illinois corporation. In 2009, Sassy purported to terminate the distributorship, which was to have continued through at least 2011. Sassy stated that it terminated the distributorship because Sahai's purchases had fallen below levels contemplated in the parties' written contract. Sahai alleges that Sassy's stated reason was merely pretext, and the real reason was to allow Sassy to begin distributing its own products through Kids Line, which is owned by the same parent corporation that owns Sassy.

Sahai has sued Sassy for breach of contract, the same claim Sassy makes against Sahai in its counterclaim. Before the court is Sassy's motion for summary judgment on the claims against it. For the reasons that follow, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed except where noted. Somewhere around 1999 or 2000, Jackel Australia began to distribute Sassy baby products in Australia. Jackel's efforts were unsuccessful, and its general manager for marketing, Sudhakar Rao, told Sassy that Jackel would no longer distribute its products. In mid-2001, Rao left Jackel, and his former contact at Sassy,

Torjus Lundevall, suggested that Rao form his own company to distribute Sassy products in Australia. Rao took Lundevall's advice and formed Sahai Pty. Ltd. On May 4, 2002, Sahai and Sassy entered into a distributorship agreement under which Sahai was Sassy's exclusive distributor in Australia through 2007.

Two years before the contract was to expire and at the behest of its bank, Sahai asked Sassy for a long-term extension to ensure that Sahai would remain Sassy's exclusive distributor in Australia through at least 2010. Negotiations over extending the distributorship began in July 2005 and involved Rao acting on behalf of Sahai, and Tom Winters and Fritz Hirsch on behalf of Sassy. Over the course of the next ten months, Rao, Winters, and Hirsch exchanged numerous e-mails proposing terms for a new contract. Sassy at first preferred an extension through only 2008 or 2009, and proposed annual sales in the following amounts: $750,000 for 2006, $900,000 for 2007, $1,150,000 for 2008, and $1,400,000 for 2009. In his e-mail, Winters referred to those annual sales figures as goals. Winters also told Rao that failing to meet those goals "would not be used as a primary reason to terminate" the distributorship.[1] *See* Rao Deposition (attached as Exhibit A to Sahai's Statement of Additional Fact [135-1]) at A8 (Rao's recollection of Winter's statement).

Rao believed that Winters' proposed annual sales figures had just been pulled out of a hat and were unrealistic. He proposed setting the proposed annual sales figure for 2006 based on

---

[1] During his deposition, Rao recalled Winters telling him that Sassy would not use any failure by Sahai to meet sales goals as a primary reason for terminating the parties' contract. Sassy objects to Rao's testimony as hearsay. However, as director of international sales, Winters was speaking within the scope of his employment and, therefore, his statement is not hearsay. *See* Fed. R. Evid. 801(d)(2)(D) (a statement offered against an opposing party made by an employee on a matter within the scope of his employment is not hearsay). Sassy offers no other basis for its objection to the statement and, therefore, the objection is overruled.

what Sahai purchased during 2005, with 10% annual growth for each year after that. Rao also continued to press for a contract through 2010, and asked for a "compensation clause," under which Sassy would be required to make a severance payment in the event it terminated the contract early. Sassy rejected the request for a compensation clause, but continued negotiating over the proposed sales figures and the term of the contract.

On May 1, 2006, the parties reached an agreement on the terms of a new contract (the "Distributorship Agreement"), which became effective on July 13, 2006. The Distributorship Agreement contained the following terms regarding sales figures and length of the contract:

> DISTRIBUTOR agrees to expend its best efforts in purchasing, marketing, promoting, advertising, distributing, and selling, wholly within the Territory, the Products supplied to it by Sassy, Inc. under this Agreement. DISTRIBUTOR will from the year starting 01/01/2006 buy a yearly minimum of $580,000 for the territory. The items in schedule A shall include all available products in Sassy, Inc.'s Developmental Toy line and Bath line, and will be updated yearly in accordance with Sassy, Inc.'s product development in these two product lines. DISTRIBUTOR will increase the minimum to $638,000 for year 2007, $700,00 for year 2008, $770,000 for year 2009, $847,000 for year 2010 and $932,000 for year 2011. It is further agreed that the Distributor and Sassy, Inc. will renegotiate the contract to set new minimums for year 2012 and thereafter.

Distributorship Agreement (attached as Exhibit A to the Amended Complaint [77-1]) ¶ 14. The Distributorship Agreement also contained the following language regarding Sassy's interest in the goods that it would sell to Sahai:

> Sassy, Inc. represents and warrants that it . . . is possessed of all right, title, and interest in and to the Products, free and clear of all liens, encumbrances, security interests, restrictions, and claims thereover.

*Id.* ¶ 1.

Paragraphs 24 and 26 describe the circumstances under which the Distributorship Agreement could be terminated. Under paragraph 24, Sassy could terminate "with cause, upon ninety (90) days written notice, at which time all payments and obligations of DISTRIBUTOR, if any, shall become automatically due and payable within thirty (30) days." *Id.* ¶ 24. Additionally, under paragraph 26:

> Material breach of this Distributorship Agreement by either party constitutes grounds for termination by the other party of the terms of the Distributorship Agreement, and its responsibilities thereunder, without waiving its respective rights to recover incurred damages. Upon occurrence of a material breach, the non-breaching party shall have the duty to notify the breaching party of the occurrence of same, and permit that party to correct or otherwise resolve the basis for breach within thirty (30) days of the receipt of said notification.

*Id.* ¶ 26.

Finally, the Distributorship Agreement contained a non-waiver clause:

> Failure or delay of either party at any time to require performance or otherwise enforce its rights under this Agreement shall not be construed to be a waiver of such rights.

*Id.* ¶ 32.

In 2006, the first year under the Distributorship Agreement, Sahai purchased products totaling $408,498.88, $171,501.12 less than the purchase amount listed in paragraph 14. Sassy never broached the subject of the shortfall with Sahai. In 2007, Sahai's purchases dramatically increased to $730,000, well over the $638,000 purchase amount listed in paragraph 14. In recognition of the increase, Sassy gave Sahai its "Largest Sales Increase for Sassy Distributors in 2007" award.

However, in 2008, Sahai's purchases dropped to just $344,134 of products, far below the

$700,000 purchase amount listed in paragraph 14 of the Distributorship Agreement. Sahai attributes the decrease to numerous challenges it faced that year, such as an economic downturn, high interest rates, soaring food and oil prices, and a sharp drop in retail sales for toys and clothing. It also attributes the decrease in part to buyers' eroding interest in Sassy's then-existing line of toys, and Sassy's weak development of new toys in 2008. Sassy developed fewer new products in 2008 of interest to its international buyers because it focused instead on developing a line of toys it expected to be of interest only to buyers in the United States, and because it was redesigning items to reduce the amount of paint used on them.

The economy and Sassy's lack of development of new toys in 2008 impacted not just Sahai's purchases, but purchases by Sassy's other distributors as well. Across the board, distributors' purchases were down in 2008 compared to the prior year.

Despite Sahai's reduced purchases, on January 6, 2009, Sassy paid Sahai a Co-op Rebate of $9,291.64, a percentage of its purchases during 2008, as part of a program to give money back to certain distributors for use in advertising and marketing. Sassy had two criteria for awarding such rebates: the distributor must have either increased sales over the previous year, or exercised its best efforts to sell Sassy's products. Because Sahai had not increased its purchases during 2008, it received its rebate for having exercised best efforts.

During the first few months of 2009, Sassy began developing a new brand identity, and encouraged Sahai to begin promoting that new identity to retailers. Sassy planned to debut its new brand identity on products for sale beginning January 2010, which distributors could begin ordering in October 2009. According to Sahai, its retailers were excited about the new brand packaging that would be available for 2010, but no longer wanted to purchase products in the

existing packaging. Sahai contends that because retailers no longer wanted Sassy's soon-to-be obsolete packaging, its 2009 purchases from Sassy dropped, and it even cancelled some of the orders it had already placed with Sassy.

In April 2009, Sassy invited Rao to attend an International Summit it was holding for a few key distributors. One of the purposes of the summit was to obtain feedback on its products and to solicit suggestions for rebuilding sales after the significant drop in sales in 2008. Following the summit, Hirsch wrote to Rao on April 30, 2009, thanking him for attending and asking for a written recap. On May 6, 2009, Hirsch wrote again to ask Rao how his written recap was coming. After Rao submitted the report, Hirsch wrote to him on May 10, 2009, thanking him "for your report. Nicely done. I appreciate your input and your observations." May 10, 2009 E-mail (found at Tab 15 to Exhibit B of Sahai's Statement of Additional Facts [135-1]).

About one month later, on June 23, 2009, and unbeknownst to Sahai, Sassy e-mailed Kids Line and stated that it was contemplating naming Kids Line as its distributor in Australia for 2010. Then on August 27, 2009, without any prior notice, Hirsch and another Sassy executive called Rao purporting to terminate the Distributorship Agreement for failing to meet the sales requirement for 2008, and for being on track to fail to meet the 2009 requirement as well. The following day, Sassy sent Sahai a written termination notice purporting to terminate the Distributorship Agreement for cause:

> [P]ursuant to Section 24 of the Agreement, Sassy hereby exercises its right to terminate the Agreement for cause. Sahai is currently in breach of the minimum purchase obligation for 2008, as set forth in Section 14 of the Agreement. Based on year-to-date sales for 2009, Sahai is also likely to breach the 2009 minimum purchase commitment.

Letter of August 28, 2009 (found at Tab 16 to Exhibit B of Sahai's Statement of Additional Facts [135-1]).

Following the termination, Sahai filed suit against Sassy. In its amended complaint, Sahai claims that Sassy breached the Distributorship Agreement by: (a) wrongfully terminating it (Count I), and (b) misrepresenting that the products it sold to Sahai were free and clear of all liens and security interests when, in fact, they had been pledged as collateral for a loan it had obtained (Count II). Sassy has filed a counterclaim, alleging that Sahai breached the Distributorship Agreement by (a) failing to meet purchase requirements, (b) failing to use best efforts to market Sassy products, and (c) failing to pay invoices.

Sassy now seeks summary judgment on both of the breach of contract claims against it.

## ANALYSIS

**I.     Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *See Valenti*, 970 F.2d at 365; *see also Anderson*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists. *See Anderson*, 477 U.S. at 248.

The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

The Distributorship Agreement calls for the application of Illinois law, and states that nothing in the agreement should "be construed as having created a franchise." Distributorship Agreement (attached as Exhibit A to the Amended Complaint [77-1]) ¶¶ 8, 33. Neither party contends that the Distributorship Agreement is subject to Illinois' Franchise Disclosure Act or the restrictions it places on the early termination of a franchise agreement. Accordingly, as the parties have done, the court will apply Illinois contract law.

## II.     Breach of Contract Through Wrongful Termination (Count I)

First, Sassy moves for summary judgment on Sahai's claim that Sassy breached the contract by wrongfully terminating it. In support, Sassy contends that, as a matter of law, Sahai's failure to meet the purchase amounts in paragraph 14 of the Distribution Agreement was a material breach, providing Sassy with a contractual basis for terminating the agreement.

As noted above, the parties could terminate the contract early under only two circumstances—either for cause under paragraph 24, or for a material breach under paragraph 26.[2] In its motion for summary judgment, Sassy contends that Sahai breached the Distribution Agreement by failing to purchase the required amount of products for 2008. It further contends

---

[2]The court notes that although Sassy's termination letter purported to terminate the Distributorship Agreement for cause under paragraph 24, the parties' arguments during briefing of the motion for summary judgment focus only on paragraph 26 and whether Sassy was entitled to terminate based upon a material breach by Sahai. Although Sahai notes the change in Sassy's position, it does not argue that Sassy is estopped from relying on a material breach to support its early termination due to the fact that it originally relied on cause. Accordingly, the court will not address the issue further.

that the evidence in the record establishes that the breach was material and, therefore, it is entitled to summary judgment.

The Distribution Agreement provides no guidance on determining whether or not a breach is material—it provides no examples of the types of breaches considered material, and does not define the term "material breach." In the absence of any definition within the four corners of the contract, the "determination of 'materiality' is a complicated question of fact." *See Sahadi v. Continential Illinois Nat'l Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir. 1983). Relevant factors include:

> an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage. . . . All of these issues must be resolved with reference to the intent of the parties as evidenced in large part by the full circumstances of the transaction, thus making these issues especially unsuited to resolution by summary judgment.

*Id.* at 196-97.

Sassy argues that a court may employ the framework for determining materiality set out in *Sahadi* only after it has first determined that the alleged breach involved a term that was merely "accessory" or "incidental." In support, Sassy contends that *Sahadi* involved such an accessory or incidental term, specifically, the timing of an interest payment that a borrower was willing and able to make just hours after it was due under the terms of the parties' agreement. *Id.* at 195-96. For breaches involving terms of the contract more significant than mere accessory or incidental terms, Sassy argues that courts look solely to whether the breaching party failed "to

perform an element of the agreement without which the contract would not have been made." *MAN Roland, Inc. v. Quantum Color Corp.*, 57 F. Supp. 2d 568, 570 (N.D. Ill. 1999) (internal quotation marks and citation omitted).

Sassy's attempt to establish two separate tests for materiality—one test for incidental terms and a different test for significant terms—is unsupported by authority. Courts applying Illinois law have, at times, articulated the test for materiality differently, a difference the Seventh Circuit explicitly noted in *Elda Arnhold & Byzantio, LLC v. Ocean Atlantic Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002). But as noted in *Elda*, when read together the cases establish a single inquiry into materiality that "focuses on two interrelated issues: (1) the intent of the parties with respect to the disputed provision; and (2) the equitable factors and circumstances surrounding the breach of the provision." *Id.* at 700. Thus, the *Sahadi* factors are used to determine the materiality of contractual terms, regardless of whether the terms are incidental or significant.

For instance, in *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 537 (Ill. App. Ct. 2000), a seller warranted that he had title to all of the blueprints he sold when, in fact, he did not have good title to some of them. The Illinois Appellate Court stated that the determination of materiality is a complicated question of fact. *Id.* It then stated that determining whether the seller's breach of the term warranting his ownership of the blueprints was material would require an inquiry into the *Sahadi* factors, even though it had not first determined that the term warranting ownership was merely accessory or incidental. *Id.*

Given that, under *Sahadi*, the question of materiality is one of fact, the court now examines whether Sahai has identified evidence creating a genuine dispute about the materiality

of the sales terms in the Distribution Agreement. Sahai has identified evidence that the parties intended the sales figures in the Distribution Agreement to be goals rather than requirements. Specifically, it is undisputed that during negotiations of the Distribution Agreement, Sassy's former director of international sales Tom Winters repeatedly referred to the purchase amounts in paragraph 14 as goals. It is also undisputed that Mr. Winters told Mr. Rao that the purchase amounts in paragraph 14 "'were only goals and targets and they would not be used as a primary reason to terminate.'" Sassy's Response to Sahai's Statements of Material Fact [139-1] ¶ 12 (quoting deposition transcript of Sudhaker Rao at 152).

As additional evidence that the parties intended the sales figures to be goals, Sahai relies upon the undisputed fact that its purchases in 2006 fell $171,501.12 below the 2006 sales figure in the Distribution Agreement, yet Sassy did not terminate the agreement or even express disappointment or concern over the shortage. Sahai also relies on the undisputed fact that Sassy sought to terminate its agreement with only one of its ten other international distributors who had failed to meet the purchase amounts set out in their similarly-worded distribution agreements, even though all ten had failed to meet the purchase amounts during at least one year during the period 2006-08 (seven failed to meet the purchase amounts for three or more years during that period, and Sahai was only one of three distributors who ever met the purchase amount for one year during that period).

Finally, it is undisputed that before Sassy purported to terminate Sahai for inadequate purchases during 2008, it awarded Sahai a Co-Op Rebate in recognition of the best efforts Sahai put forth during 2008 in marketing and distributing Sassy products.

By raising a genuine question of fact regarding the materiality of the purchase amounts in

paragraph 14, Sahai has survived Sassy's motion for summary judgment. Therefore, the court need not address Sahai's argument why the motion for summary judgment should be denied even if Sahai had been unable to raise a genuine question of material fact.

## III. Breach of Contract Through Misrepresentation (Count II)

Next, Sassy moves for summary judgment on Sahai's claim for breach of contract based on Sassy's false warranty that products sold under the Distribution Agreement would be free and clear of any security interests. In fact, it is undisputed that Sassy had pledged the products as collateral for a loan. Sassy contends that it is entitled to judgment on Count II because Sahai lacks any evidence of a causal link between Sassy's warranty and the damages Sahai seeks. *See Timothy & Timothy LLC v. Viral Genetics*, No. 06 CV 1813, 2010 WL 3155972, at *16 (N.D. Ill. Aug. 10, 2010) (party seeking damages must "show that it suffered harm that is causally linked to the specific wrongful conduct alleged").

In Count II, Sahai seeks as damages the $2,258,182.20 in profits that Sahai contends it would have earned had it made purchases from Sassy in the full amounts anticipated by the Distribution Agreement. Sahai alleges that it failed to purchase products in the full amounts anticipated only because Sassy failed to develop "new and innovative products," which Sahai contends Sassy was financially unable to do because of the security interest in its products. Amended Compl. [77-1] ¶ 83. According to Sahai, had Sassy not been operating under the security interests, it would have had the financial wherewithal to continue to develop new products, which Sahai would have been able to sell to its retailers. Therefore, Sahai contends, had Sassy's representations been correct and had it been financially able to develop new products, then Sahai would have been able to purchase the full amount of products, and earn the

full profit, anticipated by the Distribution Agreement. *See Lanterman v. Edwards*, 689 N.E.2d 1221, 1224 (Ill. App. Ct. 1998) ("Under Illinois law, a contracting party has the right to receive the value of the benefit of his bargain, *i.e.*, the amount that will compensate him for the loss which a fulfillment of the contract would have prevented or the loss which the breach of contract has entailed.").

Although Sahai contends that Sassy failed to develop new and innovative products because the security interest in its products left it financially unable to do so, it cites no evidence to support its contention. Nor has the court found any such support. To the contrary, the parties have identified evidence that despite the existence of the security interest, Sassy developed new and innovative products both before and after 2008, including new products and packaging developed for the year beginning 2010 about which Sahai's retailers were excited. Although Sassy admitted that its offering of new products dropped for the year 2008, Sassy attributed the drop to its decision to focus on developing new products solely for the United States.

Accordingly, Sahai has identified no evidence to support its assertion that the security interest in Sassy's products left it unable to afford to develop new products. As a consequence, it has failed to establish any causal link between the wrongful conduct alleged and the damages sought. *See Timothy & Timothy,* 06 CV 1813, 2010 WL 3155972, at *16. Therefore, Sassy's motion for summary judgment on Count II of the amended complaint is granted.

## CONCLUSION

For the reasons stated, Sassy's motion for summary judgment is denied in part and granted in part as follows: the motion for summary judgment is denied as to Count I, and granted as to Count II. The parties shall report for a status hearing on March 8, 2012, at 11:00 a.m. to set a date for trial.

ENTER:

DATE:  February 21, 2012 _____
Blanche M. Manning
United States District Judge